**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| LEARNQUEST, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>KYNDRYL, INC.,<br><br>                    Defendant. | Case No. 1:25-cv-06880-JSR<br><br><br>Oral Argument Scheduled:<br>November 13, 2025, at 4 p.m. |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT KYNDRYL, INC.'S**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.    LearnQuest and Kyndryl enter into a nonexclusive Agreement for the provision of training and training-related services. ................................................. 3

    B.    Kyndryl issues an RFP for Managed Learning Services while the Agreement is in force, and LearnQuest willingly participates. ............................. 5

    C.    Almost a year after the RFP process concludes, LearnQuest files this lawsuit. ................................................................................................................ 6

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT ....................................................................................................................... 7

    A.    LearnQuest has failed to adequately plead a breach-of-contract claim. ................. 7
        1.    LearnQuest's breach-of-contract claim cannot be reconciled with the plain and unambiguous language of the Agreement. ........................... 7

        2.    LearnQuest's theory of the case cannot be reconciled with its own contemporaneous conduct. ........................................................................ 11

        3.    LearnQuest's breach-of-contract claim is inconsistent with other language in the Agreement, including its non-waiver provisions ............ 12

        4.    LearnQuest has failed to identify the conduct allegedly giving rise to its breach-of-contract claim. ............................................................... 13

    B.    LearnQuest's implied-covenant claim is duplicative of its breach-of-contract claim and should be dismissed on those grounds. .................................. 14

    C.    LearnQuest's remaining claims, for promissory estoppel and unjust enrichment, also fail as a matter of law. ............................................................. 16
        1.    LearnQuest's equitable claims must be dismissed because they relate to the same subject matter as the Agreement. .............................. 16

        2.    LearnQuest has also failed to plausibly allege either of its equitable claims. .............................................................................................. 17

CONCLUSION .................................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*32 W. 39th Midtown Props. v. Zee Co.*,
  2020 WL 210007 (N.Y. Sup. Ct. 2020) ................................................................. 17

*111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*,
  220 A.D.3d 435 (N.Y. App. Div. 2023) ................................................................ 15

*Appaloosa Inv. L.P.I. v. Fed. Home Loan Mortg. Corp.*,
  2022 WL 2720520 (2d Cir. July 14, 2022) ........................................................... 11

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
  356 F. Supp. 3d 379 (S.D.N.Y. 2019) ....................................................... 14, 15, 16

*Arma v. Buyseasons, Inc.*,
  591 F. Supp. 2d 637 (S.D.N.Y. 2008) .................................................................. 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 6

*Avilon Auto. Grp. v. Leontiev*,
  194 A.D.3d 537 (N.Y. App. Div. 2021) ............................................................... 17

*Bader v. Wells Fargo Home Mortg. Inc.*,
  773 F. Supp. 2d 397 (S.D.N.Y. 2011) ............................................................ 16, 17

*Bank of Am., N.A. v. Wm. V. Schmidt Co.*,
  2011 WL 1334844 (S.D.N.Y. Mar. 25, 2011) ..................................................... 10

*Barlow v. Skroupa*,
  221 A.D.3d 482 (N.Y. App. Div. 2023) ............................................................... 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 6, 7

*Bent v. St. John's Univ., N.Y.*,
  189 A.D.3d 973 (N.Y. App. Div. 2020) ............................................................... 16

*Burgdorf v. Kasper*,
  83 A.D.3d 1553 (N.Y. App. Div. 2011) ............................................................... 10

*Carlyle Aviation Mgmt. Ltd. v. Frontier Airlines, Inc.*,
  711 F. Supp. 3d 225 (S.D.N.Y. 2024) .................................................................... 3

*Casita, L.P. v. Glaser*,
    907 N.Y.S.2d 436 (Table) (N.Y. Sup. Ct. 2010) ................................................................12

*Condor Funding, LLC v. 176 Broadway Owners Corp.*,
    147 A.D.3d 409 (N.Y. App. Div. 2017) ..............................................................................16

*Cont'l Bldg. Prods. Operating Co., LLC v. Lafarge N. Am., Inc.*,
    2018 WL 1583309 (S.D.N.Y. Mar. 27, 2018) ......................................................................7

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) ................................................................................................15

*Doyle v. Mastercard Int'l Inc.*,
    700 F. App'x 22 (2d Cir. 2017) ...........................................................................................14

*Farricker v. Penson Dev., Inc.*,
    513 F. App'x 46 (2d Cir. 2013) .............................................................................................9

*Fed. Ins. Co. v. Am. Ins.*,
    258 A.D.2d 39 (N.Y. App. Div. 1999) ................................................................................11

*Framework MI, Inc. v. CVS Health Corp.*,
    2021 WL 2403365 (S.D.N.Y. June 11, 2021) .....................................................................13

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset*,
    7 N.Y.3d 96 (2006) ..............................................................................................................12

*Fuoco Grp., LLP v. Weisman & Co.*,
    222 A.D.3d 619 (N.Y. App. Div. 2023) ..............................................................................10

*Harbor Distrib. Corp. v. GTE Operations Support Inc.*,
    176 F. Supp. 3d 204 (E.D.N.Y. 2016) ................................................................................13

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ....................................................................................................7

*Harris v. Provident Life & Accident Ins.*,
    310 F.3d 73 (2d Cir. 2002) ..................................................................................................14

*Highlands Ins. v. PRG Brokerage, Inc.*,
    2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) .............................................................................9

*JFK Fam. Ltd. P'ship v. Millbrae Nat. Gas Dev. Fund 2005, L.P.*,
    873 N.Y.S.2d 234 (Table) (Sup. Ct. 2008) .........................................................................15

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ..................................................................................................7

*Merit Grp., LLC v. Sint Maarten Int'l Telecomms. Servs., NV,*
    2009 WL 3053739 (S.D.N.Y. Sep. 24, 2009) ............................................................8

*Ohanian v. Apple Inc.,*
    2022 WL 826415 (S.D.N.Y. Mar. 18, 2022) ..........................................................16

*Primex Int'l Corp. v. Wal-Mart Stores, Inc.,*
    89 N.Y.2d 594 (1997) .............................................................................................10

*Randolph Equities, LLC v. Carbon Cap., Inc.,*
    648 F. Supp. 2d 507 (S.D.N.Y. 2009) ....................................................................12

*RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.,*
    692 F. Supp. 3d 135 (S.D.N.Y. 2023) ....................................................................17

*Rivera-Ortiz v. Cook,*
    225 A.D.3d 1145, 1147 (N.Y. App. Div. 2024) .....................................................11

*Schlaifer Nance & Co. v. Est. of Warhol,*
    194 F.3d 323 (2d Cir. 1999) ...................................................................................14

*Spinelli v. Nat'l Football League,*
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) .......................................................................7, 9

*Srivatsa v. Rosetta Holdings LLC,*
    213 A.D.3d 514 (N.Y. App. Div. 2023) .................................................................17

*Stevens v. Stevens,*
    11 A.D.3d 791 (N.Y. App. Div. 2004) ...................................................................11

*Titus v. UMG Recordings, Inc.,*
    2023 WL 8039622 (S.D.N.Y. Nov. 20, 2023) ........................................................15

*Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.,*
    111 F. Supp. 2d 450 (S.D.N.Y. 2000) ......................................................................9

*Willis Re Inc. v. Herriott,*
    550 F. Supp. 3d 68 (S.D.N.Y. 2021) ......................................................................13

**Statutes, Rules, and Other Authorities**

Fed. R. Civ. P. 8(a) ...................................................................................................1, 9, 13

Fed. R. Civ. P. 11 ........................................................................................................1, 14

Fed. R. Civ. P. 12(b)(6) ...............................................................................................6, 13

*Designate*, BLACK'S LAW DICTIONARY (12th ed. 2024) .................................................8

*Designated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/thesaurus/designated (last visited Oct. 8, 2025) ................................................8

## PRELIMINARY STATEMENT

This case implicates a question central to all relationships: *Are we exclusive?*  Many times, the answer isn't obvious (or the question wouldn't need to be asked).  Here, it is.  The Supplier Relationship Agreement ("SRA") governing the relationship between LearnQuest, Inc. ("LearnQuest"), a business training provider, and Kyndryl, Inc. ("Kyndryl"), one of its customers, could not be clearer: it explicitly provides that "[*t*]*his Agreement is nonexclusive*," and that either party is free to "acquire … competitive goods and services."

Consistent with that provision, Kyndryl held an open request for proposal ("RFP") process for certain training services beginning in June 2023—more than a year after entering into the SRA. LearnQuest itself participated willingly in that process, which culminated in the selection of a different company in August 2024—well before the SRA expired.  Nevertheless, LearnQuest now claims that the SRA's language doesn't really mean what it says, and that the RFP process and outcome, along with other unidentified contracts allegedly granted to other unidentified providers, violated the parties' allegedly exclusive relationship.  LearnQuest's position appears to be premised entirely on a single provision in the parties' Statement of Work ("SOW"), executed shortly after the SRA, which refers to LearnQuest as Kyndryl's "designated Managed Learning Services provider," a term it contends was "commonly understood" to denote exclusivity or, at least, a right of first refusal.  But that is a vanishingly slender reed, and one that certainly cannot support any of LearnQuest's causes of action under Federal Rules of Civil Procedure 8(a) or 12(b)(6).  Indeed, there is a strong argument to be made (at a later date, perhaps) that the Complaint does not even meet the standards set forth by Rule 11.

*First*, the SRA's non-exclusivity provision is clear and unambiguous, and the SOW's description of LearnQuest as a "designated … provider" does not contradict it in any way.  In basing its argument on some purported "common understanding" extrinsic to the contract,

LearnQuest runs afoul of the SRA's integration clause, which holds that the written agreements between the parties "supersede any prior course of dealing, discussions or representations," as well as the bedrock principle that extrinsic evidence may not be used to create an ambiguity where none exists. *Second*, even if LearnQuest could tiptoe past that graveyard, it fails to allege any *facts*—extrinsic or otherwise—that might make LearnQuest's conclusory assertion plausible (or even conceivable). As a party to the purported "common understanding," LearnQuest should have been able to do so—unless, of course, no such understanding ever existed. And *third*, as if all that weren't enough to doom LearnQuest's breach-of-contract claim, there is also its own willing participation in the RFP process, which makes plain that LearnQuest itself did not share the ostensible "understanding" it seeks to foist upon Kyndryl and this Court.

*Finally*, LearnQuest's other causes of action fare no better. Its claim for breach of the implied covenant of good faith and fair dealing (Count II) is predicated on the same alleged facts underlying its breach-of-contract claim and thus must be dismissed as duplicative. The same is true for LearnQuest's claims for unjust enrichment (Count III) and promissory estoppel (Count IV), neither of which can stand in light of the valid contract that governs the subject matter of the dispute.

For these reasons, and as discussed in greater detail below, this Court should dismiss Plaintiff's complaint in its entirety, with prejudice.

## BACKGROUND[1]

**A.    LearnQuest and Kyndryl enter into a nonexclusive Agreement for the provision of training and training-related services.**

Kyndryl is a provider of IT infrastructure services.  LearnQuest provides "global IT and business skills training for businesses and government agencies."  Compl. ¶¶ 9–10.  Beginning in or around November 2021, Kyndryl and LearnQuest allegedly "discussed and negotiated the terms and conditions under which Kyndryl would engage LearnQuest as" its Managed Learning Services ("MLS") provider.  *Id.* ¶ 16.  LearnQuest alleges that during these discussions, "Kyndryl committed … to sign an agreement with LearnQuest as Kyndryl's exclusive global MLS provider" (*id.* ¶ 17), but it provides no details as to when or how that "commitment" allegedly occurred.

On March 11, 2022, LearnQuest and Kyndryl executed the SRA.  That agreement states that Kyndryl "*may* order deliverables [] and services available from LearnQuest" (Ex. A at 1 (emphasis added)) and that any "[d]etails regarding the Deliverables and Services" would appear in subsequently drafted "statements of work."  Compl. ¶¶ 16–18; Ex. A at 1.  The parties agreed that the SRA and any applicable statements of work "are the complete agreement (Agreement) regarding transactions hereunder" (Ex. A at 1) and that the SRA "supersede[d] any prior course of dealing, discussions or representations between the parties regarding the subject matter hereof." *Id.* § 15(xi).

Despite allegedly discussing making LearnQuest Kyndryl's "exclusive global provider" (Compl. ¶ 17), the parties ultimately—and explicitly—agreed that their relationship would be

---

[1] The facts set forth herein are based on the allegations of the amended complaint, documents attached to it or incorporated by reference, and materials relied upon and integral to the complaint, all of which may properly be considered on a motion to dismiss.  *E.g.*, *Carlyle Aviation Mgmt. Ltd. v. Frontier Airlines, Inc.*, 711 F. Supp. 3d 225, 228 n.1 (S.D.N.Y. 2024).  The documents submitted here—in particular, the SRA, the SOW, and the RFP—feature prominently and are relied upon by LearnQuest in its Complaint.  Indeed, LearnQuest even alleges that it "filed [the agreements] under seal" (despite not actually doing so).  Compl. ¶ 21.  These documents are attached as exhibits to the Declaration of George E. Mastoris.  All "Ex." citations refer to the exhibits to the Mastoris Declaration.

nonexclusive: "The Agreement is nonexclusive and either party may design, develop, manufacture, acquire, or market competitive products or services." Ex. A § 15(v). The parties further stipulated that all "changes to the Agreement must be in writing signed by both parties" (*id.* § 15(vi)) and that any "effective waiver[s]" required the same. *Id.* § 15(ix). Finally, the SRA also provided that "[n]either party [would] be liable to the other for special, incidental, exemplary, indirect, or economic consequently damages, or lost profits, business, value, revenue, goodwill or anticipated savings." *Id.* § 7.

Three weeks later, on or around March 31, 2022, LearnQuest and Kyndryl commenced their relationship in earnest, memorializing its initial scope in the SOW (collectively with the SRA, and as defined under the SRA, the "Agreement"). Compl. ¶ 19; Ex. B. Under the SOW, LearnQuest "agree[d] to provide training and training-related services," including, but not limited to, "instructor-led public/private training, self-paced training/e-Learning, mentoring, curriculum development, voucher purchasing, assistance with technical conferences, certification exams, LearnPass Prepay credits, and Education Subtiering Services" (collectively, the "Training Deliverables"). Compl. ¶ 29.

In introducing the scope of services that LearnQuest "may" provide, the SOW recites the reality, grounded in the SRA, that "LearnQuest is Kyndryl's Global designated Managed Learning Services Provider." *Id.* LearnQuest's Complaint relies heavily on that language, alleging that the phrase "'designated Managed Learning Services Provider' is commonly understood to be the provider to whom the enterprise routes all managed-learning work in the first instance." Compl. ¶ 20. But contrary to LearnQuest's allegations, there is no provision in the SOW that requires Kyndryl to "route all managed-learning work" to LearnQuest "in the first instance." *Id.* Nor does the SOW refer to LearnQuest as the "exclusive" provider of MLS for Kyndryl or otherwise change

any of the provisions of the SRA described above. Instead, the SOW expressly "adopts," "incorporates," and "subjects" itself to the SRA's "terms and conditions." Ex. B at 1. Indeed, upon entering into the SOW, the parties were required to "agree that (i) they have read the SRA, (ii) they have the right and authority to execute this SOW (which incorporates by reference the SRA) and (iii) they agree to be bound by the terms and conditions of the SRA and SOW and any Attachments hereto or thereto as if the undersigned were the named parties in the SRA." *Id.* at 8. In other words, the SOW in no way supplants or amends the SRA; instead, it makes clear that the SRA and SOW are meant to be read harmoniously and together constitute the complete agreement between the parties.

### B. Kyndryl issues an RFP for Managed Learning Services while the Agreement is in force, and LearnQuest willingly participates.

According to the Complaint, "LearnQuest performed and fulfilled its duties under the Agreement" after executing the SOW. Compl. ¶ 31. A bit more than a year later, on July 14, 2023, Kyndryl issued the RFP, which was entitled "RFP for Managed Learning Services." Compl. ¶ 34; *see also* Ex. C. The RFP explained that Kyndryl was "accepting proposals" to "find a qualified source to provide [MLS] to support learning across the enterprise," specifically in the services of: (1) learning content design and development; (2) learning administration searches; (3) training delivery services; (4) training logistics services; and (5) supplier management services. Ex. C at 3.

According to LearnQuest, Kyndryl told it that the RFP "was an opportunity for LearnQuest to [expand] its services beyond the services already provided and covered under the SOW," even though the SOW's scope of work explicitly (and broadly) referred to such things as "training and training-related services" and "curriculum development," which have close analogs in the RFP. *Compare* Ex. B at 1, *with* Ex. C at 3. Nevertheless (and tellingly), LearnQuest does not allege

that, at any point, it objected to the RFP on the basis that it was already the exclusive provider of MLS for the company. To the contrary, the parties actually *extended* the term of the SOW for a year—until March 31, 2025—while the RFP process was still underway, with all other terms and conditions of the Agreement "remain[ing] in full force and effect." Ex. D; *see also* Compl. ¶ 26.

On or around October 1, 2024, Kyndryl awarded the RFP to a third party, NIIT Limited. *Id.* ¶¶ 35–36. This occurred "while Kyndryl was still under its [A]greement with LearnQuest." *Id.* Nevertheless, LearnQuest's Complaint is devoid of any allegations that it protested that decision as a violation of the SRA or the SOW. Nor does it allege that Kyndryl failed to pay for the services LearnQuest continued to provide until the Agreement expired on March 31, 2025.

### C. Almost a year after the RFP process concludes, LearnQuest files this lawsuit.

On August 20, 2025, LearnQuest filed the instant Complaint. It did so without any warning to Kyndryl, which had declined to renew the parties' relationship several months earlier. As described above, its claims largely center around LearnQuest's assertion that Kyndryl breached the SOW when it awarded the RFP to another company. LearnQuest also alleges, without any factual support, that Kyndryl engaged other providers "to provide more than $50 million [] in MLS" since entering into the SOW with LearnQuest on March 31, 2022. Compl. ¶¶ 34–37. On this basis, LearnQuest brings claims for (1) breach of contract (Count I), (2) breach of the implied covenant of good faith and fair dealing (Count II), (3) promissory estoppel (Count III), and (4) unjust enrichment (Count IV). *Id.* ¶¶ 39–57.

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court must treat a plaintiff's well-pleaded allegations as true and view them in the

light most favorable to the plaintiff, this presumption of truth "is inapplicable to legal conclusions

… threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (cleaned up).  If, in the

end, the complaint's well-pleaded factual allegations are insufficient to "nudge [plaintiff's] claims

across the line from conceivable to plausible," dismissal is warranted.  *Twombly*, 550 U.S. at 570.

In resolving a motion to dismiss, courts may consider the factual allegations in the complaint, "the

documents attached to the complaint as exhibits, and any documents incorporated in the complaint

by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  And, of

especial importance here, "[i]f a document relied on in the complaint contradicts allegations in the

complaint, the document, not the allegations, control, and the court need not accept the allegations

in the complaint as true." *Cont'l Bldg. Prods. Operating Co., LLC v. Lafarge N. Am., Inc.*, 2018

WL 1583309, at *4 (S.D.N.Y. Mar. 27, 2018) (citation omitted).

## ARGUMENT

### A.  LearnQuest has failed to adequately plead a breach-of-contract claim.

1.  LearnQuest's breach-of-contract claim cannot be reconciled with the plain and unambiguous language of the Agreement.

Dismissal is appropriate where, as here, "the unambiguous terms of the contract do not

support a plaintiff's claim." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y.

2015).  LearnQuest alleges that Kyndryl breached the Agreement "by contracting with other MLS

providers to perform services Kyndryl engaged LearnQuest to exclusively perform."  Compl. ¶ 42.

But this conclusion is contradicted by the actual terms of the Agreement, which state—in no

uncertain terms—that the "Agreement is nonexclusive" and that each party may, among other

things, "design, develop, or acquire competitive products and services."  Ex. A § 15(v).  This

language, which is to be considered part of the Complaint for all purposes, categorically bars

LearnQuest from maintaining its breach-of-contract claim. *See, e.g.*, *Spinelli*, 96 F. Supp. 3d at 131–32 (dismissing breach-of-contract claim where the "[p]laintiffs' conclusions are contradicted by the actual terms" of the relevant agreements and noting that the "provisions of the parties' agreements establish the rights of the parties and prevail over conclusory allegations in the complaint"); *Merit Grp., LLC v. Sint Maarten Int'l Telecomms. Servs., NV*, 2009 WL 3053739, at *2 (S.D.N.Y. Sept. 24, 2009) (dismissal appropriate where "the express terms of the contract contradict plaintiff's allegations of breach").

In an attempt to sneak past this dispositive hurdle, LearnQuest turns to the SOW's description of LearnQuest as Kyndryl's "Global designated Managed Learning Services Provider." Compl. ¶¶ 19–20. But that is a detour to nowhere.

As an initial matter, nothing in that phrase (which plays a purely preambular part in the SOW) contradicts the language in the SRA regarding the nonexclusive nature of the contract; indeed, the word "exclusive" does not even appear. The SOW never describes LearnQuest as Kyndryl's "sole" or "only" provider of training services. And it doesn't define the words "designated" or "Managed Learning Services Provider" at all, let alone in a manner that could reasonably give rise to any such interpretation.[2] Unsurprisingly, then, LearnQuest never once contends that the actual *language* of that provision is at odds with the SRA; if anything, it appears to implicitly recognize the futility of taking such a position (somewhat deceptively, at times).[3]

---

[2] *Merriam-Webster* defines "designated" as "to decide upon … usually from a position of authority," and *Black's Law Dictionary* similarly defines "designate" as "to choose (someone or something) for a particular job or purpose." Nothing in these definitions states or implies that only one individual or entity may be so designated, a reading which would be at odds with the common usage of the term as well. *See Designated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/thesaurus/designated (last visited Oct. 8, 2025); *Designate*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[3] At several points in the Complaint, LearnQuest inserts the word "the" before the word "Global" or "designated," even though that word does not appear in the clause at issue. *See* Compl. ¶¶ 22 (misquoting SOW as designating LearnQuest "*the* Kyndryl global MLS provider") (emphasis added), 23 (same). Needless to say, that addition would be wholly superfluous if the phrase already connoted exclusivity.

Instead, LearnQuest avers that it was "commonly understood" that the reference to LearnQuest as Kyndryl's "Global designated Managed Learning Services Provider" actually meant that LearnQuest is "the provider to whom the enterprise routes *all* managed-learning work in the first instance." Compl. ¶ 20 (emphasis added). As a threshold matter, the Complaint is devoid of *any* factual allegations with respect to that "common understanding." *See Spinelli*, 96 F. Supp. 3d at 131 ("The Court cannot supply a specific obligation the parties themselves did not spell out.") (internal quotation mark omitted). Indeed, Kyndryl and this Court are left in the dark as to its nature (is it specific to the entire clause in the SOW, tied to one of the words in the SOW, or something else), how it arose (during negotiations, through common usage, or otherwise), and who else shares it (Kyndryl, the training services industry, or some broader set of entities). All this information must already be known to LearnQuest as the proponent of its preferred interpretation, and its failure to disclose any of it in the Complaint runs afoul of basic notice pleading standards. *See Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (conclusory allegations insufficient for satisfying Rule 8); *see generally Ratermann v. Pierre Fabre USA, Inc.*, 651 F. Supp. 3d 657, 664 (S.D.N.Y. 2023) (explaining that Rule 8 requires a plaintiff to "disclose sufficient information to permit each defendant to have a fair understanding of what the plaintiff is complaining about").

But even if there were such a common understanding (there isn't), and even if LearnQuest had told Kyndryl and this Court what it was (it hasn't), LearnQuest does not locate it within the four corners of the Agreement, rendering it wholly irrelevant in light of the crystalline non-exclusivity language that *does* appear in the SRA. After all, it is black-letter law in New York that extrinsic evidence may not be used to create an ambiguity where none exists. *See, e.g.*, *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) ("Thus,

9

the [New York] parol evidence rule bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous."); *Farricker v. Penson Dev., Inc.*, 513 F. App'x 46, 48 (2d Cir. 2013) (reiterating that when a contract is unambiguous, "the court is not to consider any extrinsic evidence as to the parties' intentions") (citation omitted).  And the use of extrinsic evidence is separately barred by the SRA's integration clause, which provides that the written agreements between LearnQuest and Kyndryl "supersede any prior course of dealing, discussions or representations between the parties regarding the subject matter hereof."  *See* Ex. A § 15(xi); *see also Bank of Am., N.A. v. Wm. V. Schmidt Co.*, 2011 WL 1334844, at *6 (S.D.N.Y. Mar. 25, 2011) ("It is 'generally understood that the purpose of an integration clause is to … bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'") (quoting *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (1997)).

Moreover, LearnQuest isn't simply arguing that the "non-exclusivity" provision in the SRA is itself rendered ambiguous by some piece of extrinsic evidence, as one would normally expect to see a plaintiff contend—albeit unsuccessfully, in light of the case law above.  Rather, LearnQuest wants to use (unspecified) extrinsic evidence to vary the meaning of an entirely different (and equally unambiguous) provision in the SOW, and by so doing create a conflict with the unambiguous SRA clause in turn.[4]  That game of interpretive hopscotch is doubly problematic; it is also singularly inconsistent with the canon of construction directing courts to favor validity and avoid contractual conflicts where possible.  *See, e.g.*, *Fuoco Grp., LLP v. Weisman & Co.*, 222 A.D.3d 619, 621 (N.Y. App. Div. 2023) ("[w]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is *required* to do so and to give both effect") (citation

---

[4] One could describe this as the parol evidence version of "hearsay within hearsay."

omitted); *Burgdorf v. Kasper*, 83 A.D.3d 1553, 1555 (N.Y. App. Div. 2011) ("[I]t is a cardinal rule of construction that a court adopt an interpretation that renders no portion of the contract meaningless") (citation omitted).

       2.  LearnQuest's theory of the case cannot be reconciled with its own <u>contemporaneous conduct.</u>

LearnQuest's alleged post-contract, pre-dispute conduct further establishes the absence of any breach. Under New York law, the parties' course of performance is the most persuasive evidence of their agreed intentions. *See, e.g.*, *Appaloosa Inv. L.P.I. v. Fed. Home Loan Mortg. Corp.*, 2022 WL 2720520, at *3 (2d Cir. July 14, 2022) (citing *Fed. Ins. Co. v. Am. Ins.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999)). Here, LearnQuest admits that it participated in an RFP process encompassing some or all of the same services as its purportedly "exclusive" Agreement with Kyndryl. Compl. ¶¶ 34–35 (explaining the RFP process and acknowledging that the winner was awarded "Training Deliverables" in the RFP that were previously committed to LearnQuest). In doing so willingly—as opposed to, say, sending Kyndryl an immediate cease and desist letter—LearnQuest clearly evinced its contemporaneous understanding that the SOW did not guarantee exclusivity.[5]

LearnQuest attempts to elide this issue by alleging that it believed the RFP was "an opportunity for LearnQuest to [expand] its services beyond the services already provided and covered under the SOW." *Id.* ¶ 34. But this argument fails as a matter of both fact and law. First, even if LearnQuest did possess such a belief, it is black-letter law in New York that an unexpressed, subjective intent is completely irrelevant. *See, e.g.*, *Rivera-Ortiz v. Cook*, 225 A.D.3d 1145, 1147 (N.Y. App. Div. 2024) ("The intent at issue is the objective intent of the parties

---

[5] Indeed, LearnQuest not only did not object to the RFP, it entered into an agreement with Kyndryl to extend the terms of the Agreement for an additional year, or through March 31, 2025. Ex. D; *see also* Compl. ¶ 26.

manifested by the language of the agreement; unless the agreement is ambiguous, evidence of unexpressed, subjective intentions of the parties is irrelevant.") (cleaned up); *Stevens v. Stevens*, 11 A.D.3d 791, 792 (N.Y. App. Div. 2004) ("Defendants' interpretation of the stipulation, which consists of an unexpressed subjective intent, is insufficient to override its plain language."). Second, even if LearnQuest could show that it *had* expressed such an understanding, it would have directly contradicted the language of the RFP itself—which, as discussed above (*see* Background), seeks bids on the same set of services outlined in the Agreement.[6]  *Compare* Compl. ¶ 29 (describing the Training Deliverables), *with* Ex. C at 3 (describing MLS services requested under the RFP).

### 3. LearnQuest's breach-of-contract claim is inconsistent with other language in the Agreement, including its non-waiver provisions.

LearnQuest's breach-of-contract claim fails for two other reasons as well.  First, in asserting that the SOW's preambular language was intended to trump the SRA's non-exclusivity clause, it is essentially arguing that Kyndryl waived the latter provision.  Compl. ¶ 30.  But for a waiver to be effective under New York law, there must be a "clear manifestation of an intent … to relinquish [this] known right" (*Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 516 (S.D.N.Y. 2009)), which, under the terms of the Agreement, had to have been in writing. *See* Ex. A § 15(ix) ("An effective waiver under the Agreement must be in a writing signed by the party waiving its right.").  That, of course, never occurred.[7]

---

[6] And, of course, if LearnQuest's allegations were true and the RFP and SOW dealt with different services, that would also doom its claim; after all, sending an RFP for services not covered by the SOW could not as a definitional matter breach a purported exclusivity provision in the SOW.

[7] *Cf. Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt., L.P.*, 7 N.Y.3d 96, 105 (2006) (affirming lower court's finding that plaintiff waived enforcement of noncompete agreement when it "actively encouraged and assisted" defendant in fostering a business relationship with a third party); *Casita, L.P. v. Glaser*, 907 N.Y.S.2d 436 (Table) (Sup. Ct. 2010) (finding waiver where provision stated that "[b]y acquiring Shares, each Shareholder will be deemed to have acknowledged the existence of such actual and potential conflicts of interest and to have waived any claim with respect to th[eir] existence").

In addition, there are numerous provisions in the SRA and the SOW which make clear that they are to be read as one integrated agreement. Not only does the SOW explicitly incorporate the terms of the SRA, but the SRA explicitly contemplates that "details regarding the Deliverables and Services" to be provided by LearnQuest would appear in subsequently drafted "statements of work," and that the SRA and those applicable SOWs, taken together, "are the complete agreement ('Agreement') regarding transactions hereunder." Ex. A at 1. By contrast, LearnQuest's interpretation "renders certain terms inoperable, and creates a conflict [between the SOW and SRA] where one need not exist." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 102 (S.D.N.Y. 2021) (citation omitted). Accordingly, this Court should simply enforce the parties' expectations—as evidenced by the plain terms of section 15(v) of the SRA—that their relationship was "nonexclusive," leaving them open to "design, develop, manufacture, acquire or market competitive products or services." Ex. A § 15(v).

### 4. LearnQuest has failed to identify the conduct allegedly giving rise to its breach-of-contract claim.

LearnQuest asserts that, "upon information and belief," Kyndryl has breached the Agreement by engaging unidentified providers at unspecified times over three years to "provide more than $50 million in MLS." Compl. ¶ 37. In addition to the issues outlined above, which compel dismissal with prejudice under Rule 12(b)(6), this type of conclusory allegation comes nowhere near to meeting LearnQuest's obligations under Rule 8(a). *See, e.g.*, *Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d 204, 214 (E.D.N.Y. 2016) ("Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim.") (citing cases). To the contrary, "it is fundamental that to state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise." *Framework MI, Inc. v. CVS Health Corp.*, 2021 WL 2403365, at *3 (S.D.N.Y. June 11,

2021) (citation omitted); *see also Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008) (dismissing claim based on "bare allegations" of a breach that was "unsupported by any specific facts" to support a claim and concluding that, "[i]n the absence of a clear statement of a breach, an implication of breach is inappropriate"). Where, as here, a plaintiff fails to allege any *facts* supporting the basic elements of its contract claim, thus leaving defendant without sufficient notice of the claim against it, dismissal is warranted.[8] Of course, even if LearnQuest had sufficiently pled the existence of those lost opportunities, it wouldn't make any difference: the fact is, it is impossible for LearnQuest to adequately plead *any* theory of liability based on contracts allegedly provided to other business training providers (or the RFP) because, as discussed above, the Agreement states explicitly that it is nonexclusive in nature.[9]

**B.      LearnQuest's implied-covenant claim is duplicative of its breach-of-contract claim and should be dismissed on those grounds.**

In its complaint, LearnQuest alleges that Kyndryl breached the implied covenant when it "contracted with other parties to provide the exact same services that LearnQuest was engaged to provide." Compl. ¶ 50. Because this cause of action (Count II) is completely duplicative of LearnQuest's breach-of-contract claim, it should also be dismissed.

"New York law … does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Doyle v. Mastercard Int'l Inc.*, 700 F. App'x 22, 24 (2d Cir. 2017) (quoting *Harris*

---

[8] For example, to the extent that any of LearnQuest's claims rely on a breach that occurred before August 20, 2023—i.e., two years before the complaint was filed—they are untimely under the terms of the Agreement and must be dismissed. *See* Ex. A § 12 ("Neither party will bring a legal action arising out of or related to the Agreement more than two years after the cause of action arose.").

[9] Given the clear-cut nature of the contractual language, this may be one of those rare cases which fails to meet the standards set forth by Rule 11(b) (with any pleading, an attorney certifies "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that "the claims … are warranted by existing law," and "the factual contentions have evidentiary support"); *see also Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (explaining that claims "without a colorable basis" are subject to sanctions under Rule 11). To date, Kyndryl has not served a Rule 11 motion on LearnQuest, but reserves all rights in this regard.

*v. Provident Life & Accident Ins.*, 310 F.3d 73, 81 (2d Cir. 2002)).  Here, "the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."  *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 400 (S.D.N.Y. 2019) (Rakoff, J.).  Specifically, LearnQuest alleges, *for both counts*, that, despite the fact it spent capital to "serve Kyndryl's needs," Kyndryl breached the Agreement "by contracting with other MLS providers to perform services Kyndryl engaged LearnQuest to perform."  *Compare* Compl. ¶ 42, *with id.* ¶¶ 49, 50.  That admission is dispositive.  *See Arcadia*, 356 F. Supp. 3d at 400; *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.").

Even assuming, *arguendo*, that LearnQuest could point to some difference between the predicates of its claims for breach and under the implied covenant, the latter would still fail.  That is because LearnQuest locates the implied duty in its assertion that, notwithstanding the language of the SRA, "LearnQuest [was to] be *the* global MLS provider for Kyndryl."  Compl. ¶ 45 (emphasis added); *see also id.* ¶ 46 (discussions regarding "LearnQuest being *the* global MLS provider") (emphasis added).  But in advancing this argument, LearnQuest doesn't seek to fill a gap in the parties' Agreement, which speaks directly to the issue of exclusivity; rather, it seeks to override the SRA's non-exclusivity provision.  Under New York law, however, an implied duty may not "include any term inconsistent with the terms of the contractual relationship" or be used "to create independent contractual rights."[10]  *Titus v. UMG Recordings, Inc.*, 2023 WL 8039622,

---

[10] Further, to the extent that LearnQuest intends to bring any such claim based on the negotiations had entering into the Agreement, the parties agreed that that "[t]he Agreement supersedes any prior course of dealing, discussions, or representations between the parties regarding the subject matter hereof."  Ex. A § 15(xi).

at *12 (S.D.N.Y. Nov. 20, 2023) (citation omitted); *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 220 A.D.3d 435 (N.Y. App. Div. 2023) ("the implied duty of good faith and fair dealing does not imply obligations inconsistent with other terms of the contractual relationship") (citation omitted); *see also JFK Fam. Ltd. P'ship v. Millbrae Nat. Gas Dev. Fund 2005, L.P.*, 873 N.Y.S.2d 234 (Table) (Sup. Ct. 2008) ("the implied covenant is best understood as a way of implying terms in the agreement, whether to analyze unanticipated developments or fill gaps"). Accordingly, even if LearnQuest's claim for breach of the implied covenant were non-duplicative, it would still be barred thanks to the Agreement's plain and unambiguous language.

### C. LearnQuest's remaining claims, for promissory estoppel and unjust enrichment, also fail as a matter of law.

LearnQuest's claims for promissory estoppel (Count III) and unjust enrichment (Count IV) should be dismissed on two separate grounds: first, because there is a valid contract that governs the dispute; and second, because LearnQuest has failed to plausibly allege either one.

#### 1. LearnQuest's equitable claims must be dismissed because they relate to the same subject matter as the Agreement.

Equitable claims such as promissory estoppel and unjust enrichment may be enforced only where no valid contract governs the subject matter at issue. Here, that is not the case; as explained in Section C.2, *infra*, each claim relates directly to LearnQuest's alleged rights under the Agreement. Accordingly, both should be dismissed. *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011) (promissory estoppel "applies only in the absence of a valid and enforceable contract"); *Bent v. St. John's Univ., N.Y.*, 189 A.D.3d 973, 975 (N.Y. App. Div. 2020) (same); *Ohanian v. Apple Inc.*, 2022 WL 826415, at *4 (S.D.N.Y. Mar. 18, 2022) (citation omitted) (unjust enrichment claims are "proper only in 'unusual situations' where there is no traditional contract or tort claims"); *Arcadia*, 356 F. Supp. 3d at 401 (same).

16

2.  LearnQuest has also failed to plausibly allege
    <u>either of its equitable claims.</u>

To successfully plead a claim for promissory estoppel under New York law, a plaintiff must allege (1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance. *See, e.g.*, *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 147 A.D.3d 409, 411 (N.Y. App. Div. 2017). Here, LearnQuest's claim relies on its contention that Kyndryl made a "clear and unambiguous promise" that LearnQuest would "be given the first opportunity to deliver" managed learning services. But that allegation is wholly conclusory; LearnQuest has not alleged a single specific *fact* to support that legal contention, as it must. *See, e.g.*, *Srivatsa v. Rosetta Holdings LLC*, 213 A.D.3d 514, 515 (N.Y. App. Div. 2023) ("The court correctly dismissed the promissory estoppel claims as plaintiff failed to allege a clear and unambiguous promise."); *Barlow v. Skroupa*, 221 A.D.3d 482, 484 (N.Y. App. Div. 2023) (same); *32 W. 39th Midtown Props. v. Zee Co.*, 2020 WL 210007 (N.Y. Sup. Ct. 2020). Despite being the alleged recipient of that alleged promise, LearnQuest does not plead who made it, who received it, when it was made, or how it was delivered. That by itself compels dismissal. Moreover, even if LearnQuest had received (and adequately pled) such a promise from Kyndryl, it would still be unable to demonstrate reasonable reliance as a matter of law, as the Agreement itself contradicts any such alleged promise. *Bader*, 773 F. Supp. 2d. at 415. *See* Ex. A § 15(v) (providing that the Agreement is "nonexclusive" and entitles either party to "acquire … competitive products or services").

As to unjust enrichment, such a claim is available only where "the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 692 F. Supp. 3d 135, 154 (S.D.N.Y. 2023) (citation omitted). LearnQuest alleges that Kyndryl "was unjustly enriched by retaining the benefits of LearnQuest's program

build-out, know-how, and vendor enablement," but this recitation, which provides no detail whatsoever about what that build-out entailed or what know-how Kyndryl received, is far "too nebulous and speculative to plausibly allege that a specific and direct benefit was received." *Id.*; *see also Avilon Auto. Grp. v. Leontiev*, 194 A.D.3d 537, 538 (N.Y. App. Div. 2021) (dismissing unjust enrichment claim because "whether [third-party] benefitted from any receipt of the funds" from defendant was "too attenuated") (cleaned up). Moreover, the Complaint is also noteworthy for what it *doesn't* say: that Kyndryl ever failed to compensate LearnQuest for the benefits it did receive. That silence speaks volumes, and Count IV should accordingly be dismissed as well.

## **CONCLUSION**

For the foregoing reasons, Kyndryl respectfully requests that this Court dismiss the complaint with prejudice.

Dated: October 8, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

 */s/ George E. Mastoris*
George E. Mastoris
Kerry C. Donovan
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile:  (212) 294-4700
gmastoris@winston.com
kcdonovan@winston.com

*Attorneys for Defendant Kyndryl, Inc.*